IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JOLLENE PROVENCIO,

    Plaintiff,

v.                                                                                                                                   No. 1:16-cv-01268-JCH-JHR

INTEL CORPORATION

    Defendant.


**MEMORANDUM OPINION AND ORDER**

       This is an employment discrimination case that invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332. *See* Doc. 50. Plaintiff Jollene Provencio alleges a single New Mexico state law claim for retaliation by Intel in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28–1–1 to –15 (West 2008) ("NMHRA"), for participating as a witness in two internal Intel investigations in which she reported witnessing discrimination by Intel's management. She claims that thereafter Intel placed her in a hostile work environment resulting in Ms. Provencio being shunned and isolated by her colleagues, receiving reports that she was difficult to work with, deprived of her leadership role that comprised approximately 20-30% of her job duties, and given a negative job performance evaluation that set her on a track towards being fired.

       Now pending is Intel's Motion for Summary Judgment. Doc. 30. After careful consideration of the motion, briefs, and relevant law, the Court concludes that the motion should be granted.

**I.     BACKGROUND**

Ms. Provencio worked at Intel as a Systems Analyst for 19 years without any prior discipline. Doc. 30, ¶ 1; Doc. 30-1, p. 1, 31:4-6. She worked as an "individual contributor,"[1] but never worked as a manager, supervisor, or staff member at Intel. Doc. 30, ¶ 1.

**A. York Open Door Investigation**

In March 2015, about one year before Ms. Provencio resigned, she was a witness in Intel's internal Open Door Investigation stemming from her colleague Dwight York's charge that Intel practiced age discrimination ("York ODI").[2] Doc. 30, ¶ 3. During an interview with an Intel investigator, Camella McIntosh, Ms. Provencio did not specifically tell the investigator that she witnessed age discrimination. Doc. 30-1, p. 4, 72:2-6. But she did tell the investigator that some of her supervisors created a hostile work environment. *See id.* (Q: "But you did not alert Camella specifically to any discrimination correct?" A: "Just a hostile environment. Correct.") She described one supervisor, Janice Lee, as a "bully" who seemed to have "issues with other women." Doc. 33-3, pp. 1-2. She told the investigator that she should talk to another colleague, Jeanette Lee,[3] about Jeanette Lee's previous internal discrimination claim. *Id*. at p. 2. Ms.

---

[1] The parties do not explain what this term means.

[2] Two of Ms. Provencio's colleagues, Jeanette Lee and Dwight York, filed separate internal complaints alleging that Intel discriminated against them. Counsel for Ms. Provencio argues that she participated as a witness in both investigations, resulting in Intel retaliating against her. However, the evidence only shows that she participated as a witness in the Dwight York investigation. When affirmatively asked "Were you ever actually interviewed as a part of Jeanette Lee's open-door investigation?" Ms. Provencio responded "No." Doc. 37-1, p. 3, 64:21-23. Therefore, a reasonable jury could not conclude that Ms. Provencio's participated as a witness in the investigation concerning her colleague Jeanette Lee.

[3] Janice Lee and Jeanette Lee are two different people. Janice Lee was an Intel manager, whereas Jeanette Lee was Ms. Provencio's co-worker who filed a separate internal complaint alleging discrimination.

Provencio said of another supervisor, Randie Dorrance, that he "back[ed] his people," and "none of his managers will ever get written up."[4] *Id*.

About three to four months after the York ODI, in June and July 2015, Ms. Provencio's immediate supervisor, Keith Baumgardner, told her that Janice Lee, Dorrance (Baumgardner's supervisor), and Jeff Kiehne, another manager, complained that she was unapproachable and hard to work with. Doc. 33-2, ¶ 5; Doc. 30-1, p. 8, 112:11. Dorrance apparently pressured Baumgardner to "coach" Ms. Provencio about these qualities. Doc. 33-8, p. 3, 17:4-23. Coaching is a form of discipline, the first step on the ladder of Intel's progressive discipline policy. *Id*. at p. 3, 18:8-10; Doc. 33-6, p. 1. Intel's "Open Door Guidelines" permitted co-workers to complain about her to her direct supervisor, Baumgardner. Doc. 30-1, p. 1, 34:12-25.

Baumgardner and Ms. Provencio had a more amicable relationship, and Baumgardner did not want to coach Ms. Provencio because he did not believe the accusations about her were true. Doc. 33-8, p. 3, 17:20 – 18:7. As her supervisor, though, he relayed these comments to her. *Id.* at 17:21-23. But, according to Ms. Provencio, he did not tell her that he was officially coaching her. Doc. 33-6, p.1. And in any case, he told her that the complaints did not make sense, and to not worry about them. Doc. 33-2, ¶ 6. In response, Ms. Provencio told Baumgardner that she believed Intel managers were retaliating against her for participating in the York ODI, since human resources had not before received complaints about her being unapproachable or difficult to work with. *Id*. at ¶ 9; Doc. 33-5, p. 5, 88:15-25.

**B. Reduction of Ms. Provencio's Job Duties**

---

[4] In her brief, Ms. Provencio overstates the effect of this statement, arguing that she told the Intel investigator that her "male supervisor [Dorrance] would not write up any managers," and suggesting that Dorrance treated male and female workers differently. *See* Doc. 33, ¶ 4. Although the Court must construe the record in Ms. Provencio's favor, a reasonable jury could not infer from this statement that Ms. Provencio notified the investigator that Dorrance treated male and female employees differently.

3

Around the same time, in May or June of 2015 – about two to three months after Ms. Provencio participated in the York ODI – Dorrance took away Ms. Provencio's job duties as "lead" for improving the Engineering Project Tracker ("EPT"), a computer program. Doc. 33-2, ¶ 7. Dorrance instead placed Janice Lee into that position, despite Ms. Provencio's superior qualifications and the fact that EPT improvement team leader was in her job description. *Id.* at ¶¶ 7-8; Doc. 33-1, p. 7, 81:14. Baumgardner even told Provencio, "[t]hey [Dorrance and Janice Lee] want you removed from the team." Doc. 33-1, p. 6, 77:16. Until Janice Lee took over, Ms. Provencio had always been the EPT improvement team since the program was developed. Doc. 33-2, ¶ 8; Doc. 33-1, p. 7. About 20-30% of Ms. Provencio's job duties were reduced following her removal as leader.[5] Doc. 33-8, p. 4, 35:10-15. Dorrance relegated Ms. Provencio to a lesser position of "facilitator." Doc. 33-1, p. 5, 76:8-10. After the new EPT improvement team was formed, Baumgardner advised Ms. Provencio – on Janice Lee's request – to not attend the initial kick-off meeting because it was believed that she would be argumentative. Doc. 33-8, p. 4, 35:5-26-36:1-2. However, Intel managers did add Ms. Provencio to later meetings. Doc. 33-1, p. 6, 78:14. She attended about four or five more meetings after the new team was formed, merely serving as a minute-taker and providing input only when asked. *Id.* at p. 5, 76:16-17; p. 6, 78:20-24.

Colleagues starting ignoring Ms. Provencio's work e-mails, impairing her ability to carry out her job. *Id.* at p. 16, 177:7-18. After one engineer repeatedly ignored Ms. Provencio's e-mails, Ms. Provencio appealed to Janice Lee for help. *Id.* Instead of responding, Janice Lee

---

[5] Intel disputes that 20-30% of Ms. Provencio's job duties were taken away, arguing that the record only shows that 20-30% of Ms. Provencio's total work was devoted to the task of intaking feedback on EPT, not that these percentages represented an amount by which her job duties were cut. For purposes of deciding the motion for summary judgment, the Court views the evidence in the light most favorable to Ms. Provencio and believes that a reasonable jury could conclude that about 20-30% of her job duties were reduced.

likewise ignored Ms. Provencio's e-mails. *Id.* This happened two or three times. *Id.* Peers began isolating Ms. Provencio. *Id.* at p. 14, 153:6. Her health became was affected, and she was nervous and scared. *Id.* at p. 13, 152:10-23.[6]

Then, in June 2015, three months after the York ODI, Intel reneged on a promise to allow Ms. Provencio to use a spare work room. *Id.* at pp. 8-9, 100:8-25-101:1-25. Kiehne later assigned the room to himself. *Id.* at p. 9, 104:21-25. When Ms. Provencio protested in a June 10, 2015 e-mail to Kiehne, calling his actions "disrespectful and underhanded," he closed his reply e-mail by saying "Just FYI I am copying my manager as I do not want him to hear from someone else that these statements were made." Doc. 33-7, pp. 1-2.

**C. Ms. Provencio's First Internal Complaint**

In mid-June 2015, Ms. Provencio made an internal complaint with Intel's human resources department alleging retaliation, the first such complaint she had ever made in her 19 year career there. Doc. 30-1, p. 11, 188:12-25. David Sanchez, a human resources employee, investigated her complaint. Doc. 36-1. After completing his investigation, Sanchez said that he could not substantiate Ms. Provencio's claims. *Id*. at p. 2. He wrote in a post-investigation report that he found no support that Kiehne or Janice Lee retaliated against Ms. Provencio for acting as a witness in internal investigations. *Id.* He also stated that he found no evidence suggesting that individuals who worked in Ms. Provencio's organization knew she participated as a witness in the York ODI. *Id.*

Sanchez did find, however, that Kiehne and Dorrance should be given documented "coachings" – *i.e.* disciplined – for certain misbehaviors. Sanchez recommended that Kiehne receive a coaching for telling a staff member, "if people want to learn to keep their jobs around

---

[6] Ms. Provencio provided no timeline of when the events described in this paragraph occurred.

5

here they need to shut their mouth." *Id.* at p. 3. As for Dorrance, Sanchez found that he instilled fear in his staff, modeled inappropriate behavior, and was a poor manager. *Id.* at pp. 2-3. When Sanchez met Dorrance in August 2015 to discuss the post-investigation findings, Dorrance – enraged – pressured Sanchez to reveal who complained about him. Doc. 33-9, p. 1. In a later e-mail to his superiors, Sanchez wrote that he was "concerned about Randie Dorrance's behavior towards Jollene since Randie was upset about the June 2015 investigation and Randie wanted to know who I talked with during my investigation." *Id.* Despite Intel's ability to transfer or move Ms. Provencio to another department, Intel never did so. Doc. 33-5, p. 4, 67:6-9. By fall of 2015, Baumgardner told Ms. Provencio that she should take a new job outside of her department. Doc. 33-2, ¶ 10. Frustrated by months of hostility at work and sensing that it would not let-up, Ms. Provencio spent November and December 2015 looking for another job. Doc. 33-1, p. 13, 152:10-15.

Around December 2015 – nine months after Ms. Provencio participated in the York ODI – Dorrance again pressured Baumgardner to coach Ms. Provencio about her being unapproachable and difficult to work with, even though Baumgardner thought it was unwarranted. Doc. 33-9, p. 7. In a December meeting, Dorrance, Baumgardner, and Kiehne, met to discuss what the "issues" were concerning Ms. Provencio. *Id.* at p. 2. Dorrance asked Baumgardner if Ms. Provencio was "the one who went to HR." *Id.* Baumgardner confirmed this suspicion, telling Dorrance that she "was involved in 3 to 4 HR things this past year." *Id.* This disclosure drew a sharp rebuke from human resources, which later coached Baumgardner, telling him "that he should not be divulging who has talked to HR or discussed concerns with HR." *Id.*

**D. Down-graded Job Performance Evaluation**

In Ms. Provencio's annual job performance review for 2015, Intel down-graded her job performance rating. Before she participated in the York ODI and made her own internal complaints, Intel rated her performance as "Exceeds Expectations," entitling her to a $3,623 bonus. Doc. 33-4, p. 1; Doc. 30-1, p. 4, 68:1. In the following evaluation, after she participated in the York ODI, Intel rated her as "Successful," noting that she must "internalize constructive confrontation"; "need[ed] to improve how she comes across when she is not in agreement or proposes a different solution"; and "need[ed] to fully understand when she is the key decision maker and when she is not." Doc. 33-4, p. 3. A rating of "Successful" entitled Ms. Provencio to a diminished bonus of $1,700. Doc. 30-1, p. 7, 110:14 – 111:25. Moreover, before participating in the York ODI, Ms. Provencio had been rated previously as a "Regularly High Performer." Doc. 33-9, p. 6.

Also, when her annual review was delivered to her in January 2016, Sanchez from human resources attended the performance review, a sign that he was there to deliver bad news, according to Ms. Provencio. However, in a deposition Sanchez stated that while not typical, it also not unusual for a human resources representative to be present during performance reviews, and that human resources delivers bad or good news. Doc. 33-5, p. 1, 39:25-40:1-7.

**E. Ms. Provencio's Second Internal Complaint**

In January 2016, Ms. Provencio filed a second internal complaint with human resources based on retaliation by Kiehne and Dorrance for her participation in the York ODI. Doc. 33-9. During the investigation, she told the Intel investigator that Baumgardner told her that he was getting "pressure" from Dorrance to coach her. *Id.* at p. 1. When Baumgardner was interviewed as part of Ms. Provencio's January 2016 complaint, he revealed to the investigator that Dorrance

7

and Kiehne knew that Ms. Provencio "was the one who went to HR" making complaints. *Id*. at p. 2.

During this same period, on January 21, Ms. Provencio met with a professional therapist. Doc. 30-4, p. 4. She told her therapist that she continued to be frustrated with and afraid about the accusations Dorrance made against her, but that she had decided to keep working and not take medical leave. *Id*.

### F. Retaliatory Harassment by a Co-Worker

In early March 2016, Ms. Provencio filed a "Workplace Violence Documentation" report, alleging that an employee under Kiehne's supervision talked about gun violence in a way that made her fearful. Doc. 33-10, p. 1. One day in the lunch room the employee told Ms. Provencio that he could "legally shoot people" once he obtaining his concealed weapon license. *Id.* Ms. Provencio later reported that this conversation made her gravely concerned for her safety because the employee worked for Kiehne, and because she had previously reported Kiehne himself for insinuating gun violence against another employee. *Id.* at p. 2. "Given the past comments and threats with mentions of gun violence from Jeff Kiehne; to have his employee echoing in a more explicit manner is cause for extreme concern," Ms. Provencio wrote in her report. *Id.*

### G. Ms. Provencio's Resignation

Full of stress and anxiety, Ms. Provencio took an Intel sponsored sabbatical from March 22 to April 28, 2016. During that period, in mid-April, Ms. Provencio received a job offer from Presbyterian Healthcare Services. Doc. 30-1, p. 9, 125:6-8; Doc. 30-2. Two or three days later she sent Baumgardner a letter of resignation. Doc. 30-1, p. 9, 125:6-8. She felt that after her two complaints to human resources alleging retaliation for her participation in the York ODI, she had

no option but to quit. Doc. 33-2, ¶ 11. Although she did not indicate in her resignation letter that she was resigning because of retaliation, she privately told Baumgardner that the hostile work environment drove her to leave. *Id.* at ¶ 12. Before her resignation, Intel had never threatened her with being laid-off, demoted, or disciplined. Doc. 30-1, p. 10, 132:23-133:10.

The day after she sent her letter, Intel sent out a memo to employees soliciting voluntary separation payments. Doc. 33-2, ¶ 13. Ms. Provencio attempted, unsuccessfully, to rescind her resignation to see if she was eligible for the separation payment. *Id.* at ¶ 13. However, Ms. Provencio points out that even if she had received the separation payment she would have left Intel all the same, since it was an agreement to leave the company, but on more financially generous terms.

At the time of her resignation, Ms. Provencio's salary at Intel was $74,200 per year. Doc. 30-4, p. 3. Her starting salary at Presbyterian Healthcare Services was $74,000 per year. *Id.*

## II.  STANDARD OF REVIEW

<u>Summary Judgment</u>

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248–50. An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *See Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). When "the moving party does not bear

the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Cassara v. DAC Serv., Inc*., 276 F.3d 1210, 1212 (10th Cir. 2002). The burden then shifts to the opposing party to come forward with admissible evidence to create a genuine issue of material fact on that element. *See Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991).

"To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc*., 452 F.3d 1193, 1199 (10th Cir. 2006). "This does not mean that [summary judgment] evidence must be submitted in a form that would be admissible at trial." *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006). Nonetheless, "the content or substance of the evidence must be admissible." *Argo*, 452 F.3d at 1199. "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Brown v. Perez*, 835 F.3d 1223, 1232–33 (10th Cir. 2016). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id*. (quoting Fed. R. Civ. P. 56(c)(2) adv. comm. cmt.)

Here, some of what the parties rely upon are hearsay statements, and neither party has explained how they could put the substance of that evidence into an admissible form. Normally a court disregards hearsay on summary judgment when there is a proper objection to its use. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007). Here, there were no hearsay objections at all. The Court will consider the hearsay testimony for now given that many of the hearsay declarants appear on the trial witness list, suggesting that their trial testimony will

ameliorate many hearsay problems. *See Brown*, 835 F.3d at 1232 (explaining that "the most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.")

## III. ANALYSIS

Ms. Provencio alleges one single claim: retaliation in violation of the N.M. Stat. Ann. 28-1-7(I)(2) (West 2008) (making it unlawful for an employer to retaliate against "any person who has opposed any unlawful discriminatory practice.") *See* Doc. 1-1, p. 4. "In interpreting [the NMHRA], [the New Mexico Supreme Court has] previously indicated that it is appropriate to rely upon federal civil rights adjudication for guidance in analyzing a claim under the Act." *Gonzales v. New Mexico Dep't of Health*, 2000-NMSC-029, ¶ 20, 129 N.M. 586, 593, 11 P.3d 550, 557. Under the NMHRA's federal analog, Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision...." *Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1224 (10th Cir.2008). "She may do so in one of two ways. She may directly show that 'retaliatory animus' played a motivating role in the employment decision." *Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1238 (10th Cir. 2014). "Or, where a plaintiff cannot do so, she may instead rely on the three-part *McDonnell Douglas* burden-shifting approach to show that the employer's proffered reason for termination was merely a pretext." *Id.* "The plaintiff must persuade the court that the employer's reason is unworthy of belief." *Id.*

"Under the *McDonnell Douglas* approach, a plaintiff must first make out a *prima facie* case of retaliation by showing (1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id*; *accord Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 33, 135 N.M. 539, 553, 91 P.3d 58, 72. "Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate and facially nondiscriminatory reason for its decision." *Estate of Bassatt,* 775 F.3d at 1238. "If the employer satisfies this burden, then the plaintiff must establish by a preponderance of the evidence that the employer's reasons were merely a pretext for discrimination." *Id*.

1. *Prima Facie* **Case of Retaliation**

    a. **Protected Activity**

The first element that Ms. Provencio must prove as part of her *prima facie* case is that she engaged in protected opposition to discrimination. Protected activities under Title VII "fall into two distinct categories: participation or opposition." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008). The first part of Title VII's anti-retaliation provision, which makes it illegal for an employer to discriminate against any of its employees because the employee has opposed any practice made an unlawful employment practice by the statute is known as the "opposition clause," while the second part, which prohibits discrimination when an employee has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under Title VII, is referred to as the "participation clause." *Id.*

Importantly, the participation clause "only encompasses participation in formal EEOC proceedings; it does not include participation in an internal employer investigation unrelated to a

formal EEOC charge," *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015), covering "those proceedings in which participation is protected to those 'under this subchapter,' meaning subchapter VI of Chapter 21 of Title 42. 42 U.S.C. §§ 2000e–2000e–17." *Townsend v. Benjamin Enterprises, Inc.,* 679 F.3d 41, 49 (2d Cir. 2012). That subchapter refers to "investigations "that occur[] in conjunction with or after the filing of a formal charge with the EEOC." *Id.* Although no reported decision from the Tenth Circuit or the New Mexico state courts have addressed whether statements made in the course of an internal investigation are protected by the participation clause, "[e]very Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 49 (2d Cir. 2012) (collecting cases); *see also Poff v. Oklahoma ex rel. Oklahoma Dep't of Mental Health & Substance Abuse Servs.*, 683 F. App'x 691, 703 (10th Cir. 2017).

Accordingly, none of Ms. Provencio's statements to internal investigators were protected under the participation clause because that "clause only encompasses participation in formal EEOC proceedings; it does not include participation in an internal employer investigation unrelated to a formal EEOC charge." *Littlejohn*, 795 F.3d at 316. Ms. Provencio did not contact the EEOC until January 25, 2016, and she has submitted no evidence demonstrating that the York ODI and her own two internal complaints were anything other than Intel internal investigations. She cannot establish a claim of retaliation based on the participation clause for her involvement in these investigations.

She can, however, establish a claim of retaliation based on the opposition clause for her statement during the York ODI to Intel investigator Camella McIntosh that Janice Lee had

13

"issues with other women," Doc. 33-3, p. 2, meaning Ms. Provencio opposed discrimination by reporting that Janice Lee treated female workers differently from male workers. Intel disputes this, arguing that this statement cannot be construed as Janice Lee treating women workers differently than men. However, viewing the evidence in the light most favorable to the nonmovant, Ms. Provencio, a reasonable jury could conclude that Ms. Provencio opposed discrimination by stating that Janice Lee had issues with other women. Because the opposition clause provides protection for informal complaints of discrimination, that clause undoubtedly encompasses Ms. Provencio's statement. *See Crawford v. Metropolitan Government of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). Drawing reasonable inferences in Ms. Provencio's favor, as the Court must, the evidence shows that she opposed discrimination in the York ODI when she voiced her opinion that Janice Lee treated females differently. She has thus satisfied the first element of her *prima facie* case to show that she engaged in protected activity.

  b. **Adverse Action**

The second element that Ms. Provencio must prove for her *prima facie* case of retaliation is that Intel took an adverse action against her. "A challenged employment action is adverse for the purposes of a claim for retaliation under Title VII if a reasonable employee would have found [it] materially adverse." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.,* 595 F.3d 1126, 1133 (10th Cir.2010). "This requires injury rising to a level of seriousness." *Williams v. W.D. Sports, N.M., Inc.,* 497 F.3d 1079, 1087 (10th Cir.2007). "While the employers conduct need not affect the terms and conditions of employment, [] the inquiry is

14

an objective one, and not based on a plaintiff's personal feelings." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012).

In her opposition brief, Ms. Provencio alleges two adverse actions: hostile work environment and constructive discharge. *See* Doc. 33, p. 16. However, Ms. Provencio made no legal arguments about a hostile work environment, even though that type of adverse action carries with it a specific legal standard. *See e.g. McGowan*, 472 F.3d at 743 (listing elements). The Court therefore does not examine her allegation that she was subjected to a hostile work environment, since the Court is bereft of necessary law and argument needed to resolve whether Intel adversely affected Ms. Provencio's employment under that theory. The Court only examines her claim that Intel adversely affected her employment by constructively discharging her.

Constructive discharge, "occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002); *Gormley v. Coca–Cola Enters.,* 2005–NMSC–003, ¶ 10, 137 N.M. 192, 109 P.3d 280 (same elements). "[T]he standard for constructive discharge is 'substantial[.]'" *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, n. 6 (10th Cir. 2010). "It requires an employee at summary judgment to produce facts suggesting that the workplace was objectively intolerable such that a reasonable employee would have no choice but to quit." *Id*. "The bar is quite high." *Garrett,* 305 F.3d at 1221. "It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004). "Rather, Plaintiff must show that, at the time of his resignation, his employer did not allow him the opportunity to make a free choice regarding his employment relationship."

*Id.* "In contrast, a plaintiff who voluntarily resigns cannot claim that he or she was constructively discharged." *Id*. "In many cases, the circumstances surrounding resignation are not egregious enough to support a claim." *Charles v. Regents of New Mexico State Univ.*, 2011-NMCA-057, ¶ 16, 150 N.M. 17, 256 P.3d 29, 35.

In her opposition brief, Provencio argues that Intel and its managers retaliated in the following ways to adversely affect her employment that, in the aggregate, constituted constructive discharge: reduced approximately 20-30% of her job responsibilities and placed Janice Lee into the EPT lead position; gave her a negative job performance appraisal; pressured Baumgardner to coach Ms. Provencio; did not transfer Ms. Provencio to another department; ignored some of her e-mails; reneged on a promise to let her use a spare work room; and subjected her to retaliatory treatment by a co-worker. *See* Doc. 33, pp. 17-22.

The Tenth Circuit has decided several cases showing the type of evidence plaintiffs must produce to meet their burden to show constructive discharge. In *Fischer v. Forestwood Co.*, 525 F.3d 972, 980–81 (10th Cir. 2008) the court summarized one of its constructive discharge cases as follows:

> [I]n *Acrey v. American Sheep Industry Ass'n,* 981 F.2d 1569, 1574 (10th Cir.1992), we concluded a plaintiff alleging discrimination under the Age Discrimination in Employment Act produced sufficient evidence establishing she was constructively discharged. On multiple occasions, her supervisor asked her to quit, citing her age and her image. Furthermore, her supervisor repeatedly confronted her with a litany of performance shortcomings. The supervisor took away longstanding job responsibilities and gave the employee inadequate information and training to perform her new responsibilities. The plaintiff, 'too tired' to fight, finally resigned. [] Because the supervisor made it nearly impossible for the plaintiff to continue performing her job, we concluded she was constructively discharged.

Similarly, in *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009) the court found constructive discharge where the plaintiff "believe[d] her job was in

jeopardy, she was repeatedly told by her supervisors her performance was unacceptable, [] she was not provided support to perform her job when she requested it[,] … her supervisors forced her to make written 'commitments' to win certain contracts, which in her view was a deliberate attempt to set her up to fail," and was singled-out for constant and unusual performance evaluations. Likewise, in *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1134–35 (10th Cir. 2013) the court found that the plaintiff, Brown, was constructively discharged where,

> [p]rior to making an ethics complaint, Brown held a leadership position, had her own office, and received consistently high performance ratings. After her complaint, Brown received lower performance ratings. A position with an identical job description to the job Brown had been performing for the previous five years was posted on Lockheed's website. When Brown indicated she would apply for the new position, Gan strongly discouraged her from doing so and told her she was not qualified. When Jewell was selected for the new position, Brown lost her title, office, supervisory responsibilities, and L-code. Brown was made to work from home or out of the visitor's office, which doubled as a storage room. She was also denied permission to attend an annual communications conference which she had attended in the past and where she was scheduled to be recognized with an award. Most importantly, Brown was told she would be one of two employees considered for a layoff and kept in a constant state of uncertainty as to whether she would continue to have a job and, if so, what her job would be. That uncertainty continued when, after taking medical leave due to the stress and uncertainty regarding her job situation, she received no response to her inquiries as to whether she was laid off.

Ms. Provencio argues that Intel's actions—reducing her job duties and leadership role; giving her a negative job performance evaluation; Dorrance's downward pressure on Baumgardner to coach Ms. Provencio and Baumgardner's statement to her that she should look for a job in a different department—effectively made it more likely that she would be fired, forcing her to resign. Although some of the same circumstances indicating constructive discharge are present in this case as in the cases cited above—especially the reduction in Ms. Provencio's job duties and her lowered job evaluation—key differences set this case apart. For

17

instance, Ms. Provencio presented insufficient evidence for a reasonable jury to find that she was repeatedly confronted with a litany of performance shortcomings. Those criticisms that she did receive, that she was unapproachable and difficult to work with, were relayed to her by Baumgardner under Intel's Open Door Guidelines—a fact that Ms. Provencio conceded. And when she did receive these criticisms, her understanding was that she was *not* being coached by Baumgardner, belying her claim that a reasonable employee would feel compelled to leave after receiving such coaching. Although her job and leadership roles were diminished, she presented no evidence that she was singled-out for constant and unusual evaluations, that Intel set her up to fail, or that it made it nearly impossible to continue her work, all factors indicating constructive discharge in *Lockheed Martin Corp., Strickland.*, and *Acrey*.

Ms. Provencio also has not presented evidence from which a reasonable jury could conclude that at the time of her resignation she faced an impending or inevitable firing. Although Ms. Provencio alleges that she was being set-up for termination because she received a down-graded performance rating of "Successful," she pointed to no evidence suggesting that this status made it more likely that she could be fired. Her deposition testimony on this point only shows that the down-graded status prevented her from obtaining higher bonuses. Plus, "simply because an employee receives an evaluation lower than previous evaluations, the lower evaluation cannot be assumed to be a negative evaluation for the purposes of a retaliation claim." *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004). She was not "kept in a constant state of uncertainty as to whether she would continue to have a job," like the plaintiff in *Lockheed Martin Corp.* because Intel never suggested that she would be laid-off, demoted, or fired. 717 F.3d at 1135. Nor did Intel ever ask Ms. Provencio to quit outright, setting her apart from the plaintiff in *Acrey* who was asked to quit twice by her immediate supervisor, and then impliedly

18

told by yet another supervisor that if she did not resign, she would be fired. While Ms. Provencio's supervisor, Baumgardner, did tell her she should take another job, he said this in the context of relocating to a different department within Intel. That Intel could have, but did not, transfer Ms. Provencio is immaterial because there is no evidence that she requested and was denied a transfer.

Ms. Provencio's additional evidence—that mangers made false accusations about her; peers isolated and shunned her; Kiehne reneged on a promise to let her use a spare room; and Dorrance's employee harassed her—does not show that she was constructively discharged. At most, the evidence Ms. Provencio presented reveals that her working environment became difficult or unpleasant. "But an employee cannot survive summary judgment merely by producing evidence showing that working conditions were difficult or unpleasant." *Fischer,* 525 F.3d at 981. Ms. Provencio failed to establish the second element of her *prima facie* case because she did not raise a genuine issue of material fact as to whether Intel constructively discharged for opposing discrimination. The Court proceeds no further with the *McDonnell Douglas* analysis. It instead grants Intel summary judgment since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**IT IS THEREFORE ORDERED** that Defendant Intel's Motion for Summary Judgment **[Doc. 30]** is **GRANTED,** and all claims against Defendant in this case are dismissed with Prejudice**.**

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE